UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SABINE JONES,

                           Plaintiff,                   06 Civ. 0159 (RPP)

          - against -                   **OPINION AND ORDER**

JEANNE MARIE DANA, ASHWELL

MANAGEMENT, LTD., AND CENTIGON, INC.

                            Defendants.

------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      The Court, having considered the evidence presented at trial on the claims of

Plaintiff Sabine Jones and the counterclaims of Defendant Jeanne Marie Dana, finds that

clear and convincing evidence supports the following Findings of Fact and Conclusions

of Law:

**FINDINGS OF FACT**

**Mr. Jones' Death/The Role of the Various Trusts**

      1.     Plaintiff's husband suffered a paralyzing stroke in 1993 and died in

January 2001.  Before his stroke, Mr. Jones was the sole source of support for his family,

consisting of his wife, Sabine Jones ("Plaintiff"), and their disabled son, Alexander (also

known as Sandy).  Hearing Transcript ("Tr.") 4:8-24, 19:22-23.  During Plaintiff's

husband's disability following his stroke, the family continued to receive sizeable

monthly payments principally generated from Mr. Jones' stock participation interest in

his company, Jones & Associates.  Id. at 4:14-19, 4:25–5:5.  Due to buy-back provisions

in the firm's partnership agreement, however, Plaintiff was required to sell her husband's company stock upon his death. Plaintiff then had to invest the proceeds from that sale to generate sufficient income to support herself and her son and to provide for her son's future financial security. Id. at 23:11-25.

2.      Prior to Mr. Jones' death, he and Plaintiff established the Jones Living Trust to hold their community property. At the time of Mr. Jones' death, the bulk of the estate consisted of community property. Under the terms of the Jones Living Trust, once one spouse dies, the survivor becomes the executor of the decedent's estate and divides the estate equally into a decedent's interest and a survivor's interest. Thus, when Mr. Jones died, Plaintiff became the executor of her husband's estate with responsibility to divide the estate equally into the two interests. The decedent's one-half share also included a modest amount of separate property of the decedent. Plaintiff's share was placed in a revocable Survivor's Trust, consisting of the survivor's share of the community property and any separate property of the Plaintiff, and the decedent's share after paying administrative expenses was transferred to (a) a Credit Shelter Trust, to be funded up to the amount of the decedent's federal death tax exemption, which was approximately $650,000; and (b) a Marital Trust, to be funded with the balance of the decedent's share. The Marital Trust is managed by an individual co-trustee and a corporate co-trustee. The Plaintiff is the trustee and income beneficiary of the Credit Shelter Trust, the income beneficiary of the Marital Trust, and the owner of the assets in the Survivor's Trust (sometimes referred to as the Jones Living Trust). Id. at 11:24-17:19, 1263:12-1265:7; Exhibit ("Ex.") 1.

3.      As a settlor and trustee of the Jones Living Trust, and as executor and

beneficiary of her late-husband's estate, Plaintiff had to identify and inventory all community property and separate property assets that existed as of the date of Mr. Jones' death, value those assets through appraisal or other processes, allocate those assets in roughly equal portions between the decedent's half and the survivor's half, and then document the allocation to confirm to the trustees of the Marital Trust that the Marital Trust is fully funded with its appropriate share of the estate assets. Tr. at 17:10-18:9, 1258:23-1259:11.

4.      Plaintiff's counsel, Russell Allen of O'Melveny & Myers, negotiated the sale of the Jones & Associates stock. In or about May 2001, the sale was completed. Id. at 1257:7-1258:11.

**Dana Becomes Plaintiff's Financial Advisor**

5.      Before Mr. Jones' death, Plaintiff knew Defendant Jeanne Marie Dana ("Dana") only as some sort of business acquaintance of her husband. Tr. at 18:10-19:17, 178:2-15. Following the death of Mr. Jones, however, as discussed below, Dana made a concerted effort to insinuate herself into Plaintiff's life, especially her financial affairs.

6.      A few weeks after Mr. Jones' death, Dana contacted Plaintiff in Switzerland, offered condolences, and asked Plaintiff to meet her in Paris. Plaintiff was surprised to hear from Dana but agreed to Dana's request. Id. at 19:20-20:21.

7.      During their Paris meeting, Dana spoke at length of her busy life and her success as an investment advisor to large companies and wealthy individuals. Id. at 21:2-12. She said she was selling her company to the investment firm of Warburg Pincus and would maintain an office with Warburg Pincus in New York. Id. at 21:15-22:10. She spoke of the many properties she owned, including a Central Park apartment, a

condominium on Fisher Island in Florida, a home in Palm Beach, an apartment on Lake Shore Drive in Chicago, and a home in Green Farms, Connecticut (which she said she had just sold).  Id. at 22:20-23:8.

8.      After speaking of her successes and personal wealth, Dana asked Plaintiff about her financial situation.  In response, Plaintiff explained that she was required to sell her late-husband's stock in Jones & Associates and would have to invest the sizeable proceeds of that sale to generate sufficient income to support herself and her son and their residences.  Dana offered to help Plaintiff with investment of those funds at no charge to Plaintiff because of her loyalty to Plaintiff's late-husband and out of concern for Plaintiff's son.  Id. at 24:6-15.  Plaintiff did not accept Dana's offer.  Id. at 24:22-25, 27:25-28:5, 28:12-14.

9.      Thereafter, in March or April 2001, Dana called Plaintiff from New York and asked Plaintiff to meet her for lunch when she returned to California.  Plaintiff agreed and the two met at Dana's hotel in Century City, California.  Following that lunch, Dana again raised the subject of the stock sale and questioned Plaintiff as to its status.  Plaintiff explained that the sale was pending and that the proceeds were expected to be "somewhere around $24 million."  Id. at 25:1-26:6, 29:24-25.

10.      Dana also questioned Plaintiff about her choice of corporate trustee for the Marital Trust.  Plaintiff said she was going to retain Northern Trust, the corporate trustee designated in her late husband's will.  Id. at 26:7-27:2.  At that point, Dana represented that she was very knowledgeable in trust matters.  She insisted that Northern Trust was in disarray and had lost its standing in the trust business, and she urged Plaintiff to interview other trust companies.  Id. at 27:3-14.

11.     Dana also questioned Plaintiff about the status of the asset allocation process. Plaintiff explained that she was working with estate counsel, and that she and her assistant, Susan Fuller, were taking inventory of her assets and assembling an asset list. Id. at 27:22-28:11. Dana offered to help Plaintiff with the allocation at no charge to Plaintiff, insisting once again that she wanted to help out of loyalty to Plaintiff's late-husband and out of concern for the financial well-being of Plaintiff's son. Id. at 28:22-29:2. Plaintiff did not accept Dana's offer, and Dana returned to New York. Id. at 29:3-7.

12.     Dana next telephoned Plaintiff from New York to let her know she would be coming back to California. Plaintiff invited Dana to visit her at the Zapata Ranch, Plaintiff's cattle ranch in central California. Dana accepted, and she visited with Plaintiff for several days in May or June 2001. Id. at 29:3-30:2. During that visit, Dana began to cultivate a close friendship with Plaintiff and continued to question Plaintiff about her finances. Dana was informed that the sale of Jones & Associates stock had been completed. Id. at 33:18-34:9. After gaining Plaintiff's friendship and trust, she again offered to help Plaintiff with trust and estate matters. Id. at 30:1-5. She provided Plaintiff with a list of corporate trustees to consider replacing Northern Trust as well as a list of interview questions, stating that she had extensive experience in trust matters. Id. at 30:6-31:18.

13.     Although Plaintiff did not ask her to do so, Dana accompanied Plaintiff to meetings with estate counsel, with Plaintiff's existing investment advisor (Chelsea Advisors), and with the individual and corporate co-trustees of the Marital Trust. At Dana's request, Plaintiff provided Dana with powers of attorney to allow Dana to attend

meetings as Plaintiff's agent with Plaintiff's attorneys, her financial advisor, and the trustees.  Id. at 32:10-33:17, 34:10-25.

14.     Dana then asked to review the asset list that Plaintiff had already compiled.  She insisted she could do a better job than Plaintiff in allocating the assets between the Marital Trust and the Survivor's Trust, and she asked Plaintiff to provide her with access to all of Plaintiff's records regarding the assets for purposes of her allocation review.  Id. at 36:8-38:12.  Plaintiff agreed and directed her assistant to provide Dana with any records or information Dana requested.  Id. at 36:24-25.

15.     Dana also requested authority to trade on Plaintiff's brokerage accounts at Morgan Stanley.  Though Plaintiff had an account manager handling those accounts, Dana said she wanted to monitor Plaintiff's investments and make suggestions for trades. Id. at 38:13-19, 47:7-10.  Plaintiff agreed to that request as well, and she gave Dana written authorization to trade on her Morgan Stanley accounts as Plaintiff's agent.  Id. at 38:13-43:10, 44:5-48:8, 48:22-49:17, 50:15-51:7; Exs. 2, 3.  Thereafter, at Dana's suggestion, Plaintiff opened additional brokerage accounts with Ryan Beck and Legg Mason.  Dana requested and received authority to serve as Plaintiff's agent and trade on those new accounts.  Tr. at 54:1-14.  In each case, Dana stated that she was offering her help as a friend and would not charge for her efforts.  Plaintiff accepted Dana's offers of help in reliance on these representations.  Id. at 48:9-21, 49:23-50:4, 51:8-18.

**Plaintiff's Records**

16.     Over time, Dana requested virtually all of Plaintiff's original files, records, and correspondence relating to the assets of the various trusts and to Plaintiff's personal assets (the "Records").  Plaintiff provided the Records to Dana solely for the purpose of

enabling Dana to assist Plaintiff with the allocation necessary to close the estate of Plaintiff's late husband.  Id. at 51:19-53:8, 178:16-179:1, 182:4-187:23.

17.     The Records included (a) account statements, trading records, disclosures, contracts, and correspondence constituting, referring to, or relating to all of Plaintiff's individual and trust assets (including her personal property, interests in real property, and investments in bonds, stocks, and other securities) and all of the assets of the Marital Trust (including personal property, interests in real property, investments in bonds, stocks and other securities, and correspondence with the trustees); (b) Plaintiff's personal correspondence with Defendants; and (c) legal documents relating to the estate, including wills, trusts, and allocation information.  Id. at 54:1-6, 54:17-25, 56:21-58:16, 62:12-63:1, 194:19-24.

18.     Many of the documents requested by and sent to Dana were originals or Plaintiff's only copies, which Dana insisted be sent to her when she was unable to locate copies in her own files.  Dana further insisted that the documents be sent to her on a rush basis, without allowing Plaintiff's assistant any time to make additional copies, each time promising that she would return the documents once she was finished with the allocation.  Id. at 188:22-189:12, 207:3-10, 208:11-20, 209:25-211:15, 214:18-215:16, 325:15-329:10; Exs. 11, 12, 13.  Dana also requested and received certain of Plaintiff's documents from other sources, including Plaintiff's brokers, her counsel, her accountant, and the trustees of the Marital Trust.  Tr. at 189:13-191:18, 193:19-194:18, 224:7-226:2, 227:15-228:8, 234:4-236:9, 329:24-330:3.

19.     Plaintiff has made several demands to Dana, by facsimile letter and by telephone, directly and through her assistant and counsel, for return of the Records.  With

the exception of the return of a single box of documents, Dana has ignored and/or refused each of those demands.  Id. at 59:25-62:11, 63:2-66:25, 67:18-69:23, 194:25-195:3, 1271:1-1274:8; Exs. 4, 5, 69, 70.

20.     Without her complete Records, Plaintiff is unable to complete the trust allocation.  Tr. at 58:17-59:10, 352:14-353:17, 354:16-355:12, 1288:19-1289:19, 1323:1-1324:24, 1325:10-15.

### The Security Fund Investment

21.     In May/June 2001, at the Zapata Ranch, Dana recommended that Plaintiff invest in an equity fund which Dana referred to as Ashwell Management.  Dana stated that she had invested in the fund several times with great success and that a minimum $5 million investment was required.  Plaintiff responded that this amount was too high and declined to invest.  Id. at 69:24-70:25.

22.     Thereafter, in September 2001, Dana contacted Plaintiff in California by telephone call from New York to again recommend that Plaintiff invest in Ashwell Management.  In this call, Dana stated that the $5 million minimum could be satisfied by an investor group she was putting together, to consist of Dana, who would hold two shares, the Carmen Wirth Family Trust, which would hold one share, and Plaintiff with one share.  Dana recommended that Plaintiff join that group by investing $1.5 million. Id. at 71:1-72:13.  Dana stated that participation would require an immediate minimum investment of $1.2 million and a balance of $300,000 to be paid at a later date.  Id. at 84:10-23, 91:3-9; Ex. 7.

23.     On or about September 18, 2001, Dana sent Plaintiff a facsimile letter (from Dana's office in New York) in which Dana referred to the proposed investment as

"Private Equity Investment – Ashwell Ltd. Partners Fund/Pequot L." (the "Fund"). Dana provided wiring instructions, stating that "funds must be in New York by September 21, 2001." She attached to the facsimile a document entitled "Agreement For Admission As A Limited Partner In Pequot Partners Fund L.P." (the "Pequot Agreement"), which she instructed Plaintiff to sign and return by facsimile. The Pequot Agreement indicated that a copy of the limited partnership agreement was attached, but it was not. Dana further stated in the facsimile that "all other background documents have been sent to you by Fedex on September 13, 2001," but Plaintiff never received those documents. Tr. at 72:14-73:3; Ex. 6.

24.     Dana followed the facsimile with another telephone call to Plaintiff on the same day, again pressing for immediate funding of the investment. Plaintiff asked Dana for additional details about the proposed investment. In response, Dana made a number of specific representations about the investment, including the following: (a) that the investment is a private equity fund that buys privately-owned companies operating in the health care field, which it then packages into IPOs for sale in the form of securities; (b) that this particular investment would involve no more than twenty health care companies; (c) that the Fund is managed by a professional management group that has a proven track record of success; (d) that Dana had invested her own money with the Fund in the past and never lost money; (e) that the Fund would invest the money over time, but that until it was invested, Plaintiff would be paid interest on Plaintiff's investment at a rate of six percent annually, with the payments made on a quarterly basis; and (f) that Plaintiff would have a choice once a year to be paid back her initial investment or to reinvest for another year. Plaintiff took contemporaneous notes of Dana's comments during that call.

Dana did not reveal at any time during her discussions with Plaintiff that Dana had any relationship with the Fund other than as an investor in past IPO projects and as an investor in this project.  Tr. at 73:10-78:24, 95:6-96:5; Ex. 6.

26. At Dana's insistence, and because of Plaintiff's trust and confidence in Dana's knowledge and experience in financial matters and in reliance upon Dana's representations about the advisability of the investment, Plaintiff signed and returned the Pequot Agreement, which identified Dana as Plaintiff's representative and as the primary contact for all correspondence and statements concerning Plaintiff's account.  In addition, using wire transfer information provided by Dana and pursuant to Dana's instructions, on September 19, 2001, Plaintiff caused a wire transfer totaling $1.2 million to be sent to the account of Ashwell Management Ltd. with Citibank, NA to fund in large part Plaintiff's $1.5 million investment in the Fund.  Tr. at 84:10-86:25, 90:25-91:24; Ex.7.  On October 2, 2001, Plaintiff received ostensible confirmation from Ashwell Management Ltd. that it had received the wire transfer on September 20, 2001.  Tr. at 290:14-291:11; Ex. 16.  On June 5, 2002, Plaintiff, at Dana's direction, wired the balance of $300,000 to Ashwell Management's Citibank account.  Ex. 31 at C00016.

26. Plaintiff and her assistant made numerous requests to Dana for the Pequot and Ashwell prospectus documents, as well as for account statements documenting her investment, in 2001, 2002, 2003, 2004 and 2005.  In response, Dana indicated that she had the requested documents and would send them when she had time.  Nonetheless, Dana never sent, and Plaintiff never received, any of the requested documents.  Tr. at 87:2-88:10, 92:10-23, 286:21-290:13.

27. Plaintiff made several requests to Dana for the return of her investment.

To date, however, other than a single interest payment of $6,030.10, received in or about April 2002, Plaintiff has not received back any of the $1.5 million she sent Ashwell Management Ltd. for investment in the equity fund.  Id. at 291:12-291:25; Ex. 8.

## The Centigon Investments

28.     In or about July or August 2002, Dana contacted Plaintiff in Palm Desert, California by telephone call from New York to recommend immediate funding of another investment, this time with a company she referred to as Centigon, Inc.  Id. at 107:11-108:2.  Dana stated that Centigon was a brokerage company that bought preferred stocks and bonds.  Id. at 108:3-22, 110:7-14, 292:1-12.  Dana represented that Centigon would issue regular account statements so that Plaintiff would be able to track her investments. Id. at 108:23-109:2.  Dana told Plaintiff to wire transfer funds to Centigon immediately for the purchase of such bonds and stocks.  Pursuant to Dana's instructions and because of Plaintiff's trust and confidence in Dana's knowledge and experience in financial matters and in reliance on Dana's representations, on August 15, 2002 Plaintiff wire transferred $148,760 for the benefit of Centigon, Inc. to account 0210004660 at Hudson United Bank,[1] for the purchase of preferred stocks and bonds through Centigon.  Id. at 109:6-15, 110:2-5, 197:2-198:2, Ex. 10.

29.     Thereafter, Dana contacted Plaintiff and/or Susan Fuller by telephone on a number of occasions to request additional funds to invest with Centigon.  Dana insisted that those funds be sent to her directly by check made out to Centigon.  Tr. at 293:8-15. In reliance on Dana's representations and advice and because of Plaintiff's trust and

---

[1] For Exhibit 32, the Court will refer to page numbers for the Hudson United Bank's Centigon account as beginning with "C" and page numbers for the Hudson United Bank's Ashwell Management account as beginning with "A."

confidence in Dana's knowledge and experience in financial matters, when instructed to do so throughout 2003 and 2004, Plaintiff sent the requested funds to Dana for investment with Centigon. As of November 2004, Plaintiff had wired funds to Centigon or sent checks to Dana payable to Centigon totaling $772,719. Tr. at 110:15-23, 195:8-197:1, 276:17-278:21, 279:5-286:15; Ex. 15; see also infra at ¶¶ 60-88.

30.     Plaintiff made numerous requests to Dana (by telephone and in person during Dana's visits to California) for prospectus information and for account statements documenting the Centigon purchases of bonds and securities. Susan Fuller made similar requests to Dana in 2002, 2003, 2004, and 2005. Dana initially stated that she had the documents in her possession and would send them shortly. Later, Dana stated she was too busy to deal with Plaintiff's requests for documents but would have her assistant send them. Nonetheless, Dana never sent, and Plaintiff never received, any account statements or other documentation from Dana or from Centigon of her investments with Centigon. Tr. at 109:16-110:1, 292:18-295:13.

31.     Still later, beginning in or about August 2005, Dana changed her story and denied that Centigon had ever issued any account statements. Instead, Dana represented to Plaintiff that the Centigon purchases were transferred to Plaintiff's other brokerage accounts at Ryan Beck & Co. in New York, Legg Mason, Inc. in Boston, and Morgan Stanley in California, and could be identified through examination of those accounts. Id. at 110:24-112:24.

32.     In the summer of 2005, Plaintiff and her assistant reviewed the account statements for Plaintiff's Ryan Beck, Legg Mason, and Morgan Stanley accounts but were unable to locate any Centigon transactions. Moreover, the total value of receipts in

those accounts was insufficient to account for the amount Plaintiff had invested with Centigon.  Id. at 295:14-297:24, 336:23-337:24, 354:1-7.  Although Plaintiff and her assistant asked Dana to identify which stocks and bonds had been purchased through Centigon, Dana refused, claiming she was too busy.  Id. at 298:5-17.  In or about September 2005, during a meeting at Plaintiff's office in Templeton, California that was attended by Plaintiff, Susan Fuller, and Dana, Plaintiff again asked Dana to identify the Centigon investments in Plaintiff's account statements from Ryan Beck, Legg Mason, and Morgan Stanley.  Dana again refused, claiming she was too busy and had other matters to attend to.  Id. at 112:20-113:19, 117:15-25, 298:18-299:14.

33.     In late September 2005, when she picked up Dana to take her to the airport, Plaintiff again asked Dana to show her how to track the Centigon investments. Dana became angry and insisted that the transactions were all listed in the Ryan Beck, Legg Mason, and Morgan Stanley statements, that she did not have time to deal with Plaintiff's questions, and that Plaintiff should look up the transactions herself.  Id. at 114:7-116:14.

34.     To date, Plaintiff has not received any account statement, interest payment, or tax document reflecting any of her investments with Centigon.  Id. at 113:20-114:6.

### Dana's Misrepresentations

35.     Dana made a number of material misrepresentations to Plaintiff to gain her trust and confidence and to induce Plaintiff to allow Dana to take control of Plaintiff's records and her financial affairs, including the following:  (a) Dana represented to Plaintiff that Dana was a registered financial advisor, when in fact she was and is not, id.

at 122:2-8, 1150:23-24; and (b) Dana represented to Plaintiff that Dana was a consultant with Warburg Pincus and had an office within Warburg's office at 590 Madison Avenue, 21st Floor, New York, New York, when, in fact, her "office" at the 590 Madison location was simply a mail drop and answering service operated by HQ Global and was not affiliated with Warburg Pincus.  Id. at 191:19-192:21, 771:15-772:5, 776:24-767:7, 1226:22-24.

36.     Dana made a number of material misrepresentations to Plaintiff with the intent to induce Plaintiff to invest funds with Ashwell Management Ltd. and Centigon, Inc. and omitted certain material facts when soliciting those investments.  In September, at the time Dana solicited Plaintiff to wire $1.5 million to Ashwell Management Ltd. for an equity fund investment, Dana knew but did not disclose to Plaintiff that: (a) Dana was an officer of Ashwell Management Ltd., id. at 123:20-22, 124:1-11, 506:17-507:21; and (b) Dana was a signatory to and had check-writing authority on Ashwell Management Ltd.'s accounts and used those accounts to pay her personal expenses.  Id. at 96:6-8, 97:10-17, 97:18-101:24, 102:10-106:25; Ex. 9.

37.     Most significantly, Dana lied to Plaintiff about the investment of Plaintiff's funds, which were never used to purchase any stocks, bonds, partnership interest, or other investment on Plaintiff's behalf, but were instead diverted by Dana through a series of account transfers to fund her own investments and her own support and extravagant lifestyle.  See infra at ¶¶ 39-59.

38.     As established by the testimony of Daniel Rosenthal, who testified as the custodian of records for Pequot Capital Management ("Pequot"), the administrator of Pequot Partners Fund L.P., Pequot has no record of any investment by Plaintiff, the Jones

Living Trust, or the Jones Marital Trust.  Tr. at 678:11-679:4, 679:25-682:13, 683:17-685:1.  Nor does Pequot have a record of any investment in the name of Dana, Ashwell Management Ltd., or Ashwell L.P.  Id. at 689:22-690:4, 691:22-692:2.  According to Pequot's records, however, Pequot did send offering memoranda and subscription agreements for two of its funds (Pequot Health Venture Fund, a seed stage venture capital fund in the health care market, and Pequot Partners Fund, a hedge fund) to Pilar Dana in August 2001 to an address at 100 Central Park South, New York, New York, an address that Dana told Ms. Fuller was her residence during that same time period.  Id. at 191:19-25, 687:3-14, 687:22-688:1, 689:13-18, 822:25-823:2.  Pequot never received back a completed subscription agreement from that individual.  Id. at 685:1-688:16, 695:4-20; Ex. 47.  However, the subscription agreement form that Dana sent to Plaintiff in September 2001 for the Ashwell/Pequot investment (as part of a purported nine-page fax) was an incomplete copy of the 12-page subscription agreement that Pequot sent to Pilar Dana for the Pequot Partners Fund.  Tr. at 690:23-691:9; Ex. 6.

### Dana's Use of $1.5 Million in Funds Wired by Plaintiff

39.     At the direction and on the recommendation of Dana, on or about September 19, 2001, Plaintiff, as trustee of the Jones Living Trust (i.e. the Survivor's Trust), caused to be wired $1,200,000 from her Morgan Stanley account number 263011738046 (later changed to 241015922), Tr. at 207:14-22, to Ashwell Management Ltd.'s account number 3526649 at Citibank (the "Ashwell Management Citibank account"), for the purpose of investing in Ashwell Limited Partners/Pequot Fund, which is how Dana represented those funds would be invested when she solicited Plaintiff's investment of $1.5 million.  Of the $1.5 million, $1.2 million was wired to Ashwell

Management Citibank account on September 19, 2001 and $300,000 was wired to that account on June 5, 2002. Id. at 84:10-85:6, 527:25-528:2; Ex. 7; Ex. 31 at C00016, C00044.

40.     At all times relevant herein, Dana was authorized to write checks on and withdraw money from the Ashwell Management Citibank's account, and she could also transfer money from this account to other accounts. Tr. at 546:9-17.

41.     On September 27, 2001, Dana, stating under penalty of perjury that she was an officer of Ashwell Management Ltd., executed documents opening the Ashwell Management's Morgan Stanley account. Id. at 432:22–439:10, 982:23–983:24; Ex. 22. Dana was designated as the individual authorized to give orders and instructions to Morgan Stanley and to "purchase and/or sell and/or otherwise deal in any and all securities and other financial assets" for Ashwell Management Ltd. on the account. Ex. 22. Dana also had authority to trade in and borrow (or margin) on the account, as well as authority to enter into any credit arrangements with Morgan Stanley to secure such borrowings. Id. Dana could write checks on the account and she could also debit amounts out of the account through a debit card issued to her on the account. Tr. at 572:22–573:9; Ex. 22.

## Review of the Ashwell Management Ltd. Accounts

42.     From March 29, 2001 until sometime after September 26, 2001, the address of Ashwell Management Ltd. Citibank Account No. 3526649 (Bates Nos. C00001-C000181) was c/o Centigon, Inc., Box 1767, FDR Sta., New York, NY. During that period, the Citibank account did not carry a balance of over $7,500.00. On September 19, 2001, it received an electronic credit of $1.2 million from Plaintiff's

account at Morgan Stanley. Ex. 31 at C00016.

43. On September 28, 2001, Ashwell Management's Citibank account reflects a withdrawal of $750,000, Ex. 31 at C00019, and its Money Market account at Citibank shows an opening deposit of $750,000. Ex. 67 at 1.

44. On September 28, 2001, Morgan Stanley, 865 Third Avenue, New York, NY, opened a brokerage account (No. 622074593) for Ashwell Management, Ltd., Attention Jeanne Marie Dana, 590 Madison Avenue, 21st Floor, New York, NY, with a deposit of $250,000. Ex. 28 at MS00001.[2] On October 1, 2001, Ashwell Management's Citibank Account honored a check for $250,000. Ex. 31 at C00019.[3]

45. The Ashwell Management's Citibank Insured Money Market Account, No. 5108598, as of December 27, 2001, reflects a withdrawal of $250,000 as of December 17, 2001, leaving a balance of $502,172.83. Ex. 67 at 6. On December 17, 2001, Ashwell Management's Citibank account No. 3526649 reflects a deposit of $250,000 and a check withdrawal of $250,000. Ex. 31 at C00025. Ashwell Management's Morgan Stanley Margin Account reflects a deposit of $250,000 in December 2001 and a total asset value of $503,805.19, as of December 31, 2001. Ex. 28 at MS00006.

46. On January 23, 2002, $100,000 was transferred from Ashwell Management's Citibank Money Market Account Number 5108598 to Ashwell Management's Citibank Checking Account 03526049. Ex. 31 at C00028. On January 24, 2002, Ashwell Management's Morgan Stanley Account received a deposit of

---

[2] The Ashwell Morgan Stanley Account records reflect that it was a margin account. Ex. 8 (500105) (margin interest charge).

[3] Ex. 31 at C00019 reflects that the address for Ashwell Management's Citibank account was changed in October 2001 to 590 Madison Avenue, NYC, 21st Floor. As of October 2001, both Ashwell Management's Morgan Stanley account and its Citibank account had an address of 590 Madison Avenue, NYC, 21st Floor.

$50,000.  Ex. 28 at MS00015-19.  On January 25, 2002, Ashwell Management's Citibank Checking Account 3526649 honored a check for $50,000.  Ex. 31 at C00029.

47.     On February 8, 2002, Ashwell Management's Citibank Checking Account 3526649 received a deposit of $100,000, and the Ashwell Management's Money Market Account 3108598 had a withdrawal of $100,000.  Ex. 31 at C00031.  On February 8, 2002, Ashwell Management's Citibank Checking Account 3526649 received a deposit of $100,000 and its Money Market Account was debited $100,000 on February 8, 2002.  Id.

48.     On February 11, 2002, Ashwell Management's Morgan Stanley Account received a deposit of $50,000.  Ex. 28 at MS00024.  On February 12, 2002, Ashwell Management's Citibank Checking Account 3526649 honored a check for $50,000.  Ex. 31 at C00031.  On February 27, 2002, Ashwell Management's Morgan Stanley Account received a deposit of $75,000.  Ex. 28 at MS00024.  On February 27, 2002, Ashwell Management's Money Market Account 5108598 transferred $100,000 to Ashwell Management's Citibank Checking Account 3526649, Ex. 31 at C00034, and Account 3526649 honored a check for $75,000.  Id.

49.     On March 13, 2002, Ashwell Management's Morgan Stanley Account received a deposit of $50,000.  Ex. 28 at MS00036.  On March 14, 2002, Ashwell Management's Citibank Account 3526649 received a credit of $45,000 from Ashwell Management's Money Market Account 5108398, Ex. 31 at C00035, and honored a check for $50,000 on that same date.  Id.

50.     On March 28, 2002, Ashwell Management's Citibank Checking Account 3526649 received a $40,000.00 credit from Ashwell Management's Citibank Money Market Account 5108598, Ex. 31 at C00037; on March 28, 2002, Ashwell Management's

Morgan Stanley Account received a deposit of $30,000, Ex. 28 at MS00045; and on March 31, 2002, Ashwell Management's Citibank Checking Account honored a check for $30,000. Ex. 31 at C00037.

51. On April 9, 2002, Ashwell Management's Citibank Checking Account received a $15,000 transfer from Ashwell Management's Money Market Account, and on April 11, 2002 it honored a check for $15,000, drawn to an unknown payee. Id.

52. On April 15, 2002, Ashwell Management's Morgan Stanley Account received a deposit of $35,000. Ex. 28 at MS00045. On April 15, 2002, Ashwell Management's Citibank Checking Account received a transfer of $50,000 from Ashwell Management's Citibank Money Market Account, Ex. 31 at C00038, and on April 16, 2002 it honored a check for $35,000. Id.

53. On April 24, 2002, Ashwell Management's Morgan Stanley Account received a deposit of $25,000. Ex. 28 at MS00045. On April 24, 2002, Ashwell Management's Citibank Checking Account received a transfer credit for Ashwell Management's Citibank Money Market Account of $25,000, and on April 25, 2002, it honored a check in the amount of $25,000. Ex. 31 at C00040.

54. As of May 23, 2002, Ashwell Management's Citibank Checking Account had a balance of $6,225.47, and Ashwell Management's Citibank Money Market Account had a balance of $5,101.30. Ex. 28 at MS00040.

55. On June 5, 2002, Ashwell Management's Citibank Checking Account received a wire transfer of $300,000 from the trustee of Sabine Jones. Ex. 32 at C00044. On June 11, 2002, Ashwell Management's Morgan Stanley Account received a deposit of

$125,000, Ex. 28 at MS00072, and on June 12, 2002 its Citibank checking account honored a check for $125,000.  Ex. 31 at C00044.

56.     On June 26, Ashwell Management's Citibank checking Account transferred out $75,000.  Id. at C00047.  On June 27, 2002, Ashwell Management's Morgan Stanley Account received a transfer of $75,000.  Ex. 28 at MS00072.

57.     Defendant Dana has been unable to point to any evidence that she invested any of these sums in Ashwell/Pequot Partners Fund, as promised.  The Court's review of the Ashwell Management Citibank account and the Ashwell Management Morgan Stanley account, as well as the Ashwell Management Hudson United account, shows no transactions consistent with a transfer of the $1.2 million and $300,000 sent by Plaintiff to fund the purported investment in Ashwell Ltd./Pequot Fund or any other entity.

58.     Examination of the Ashwell Morgan Stanley Account, Ex. 28, shows that a debit card was used to charge numerous personal bills in London, Paris, Florida, California, and elsewhere and to deplete the balances on hand.  Similarly, an examination of the Ashwell Citibank Checking Account, Ex. 31, shows that a debit card was used to make ATM withdrawals from that account and that smaller checks were honored in amounts consistent with payments of personal expenditures.  Nowhere in Ashwell Management's accounts is there any entry reflecting any investment for Plaintiff of the $1,200,000 received from Plaintiff on September 19, 2001 or the $300,000 received from Plaintiff on June 5, 2002.  Nor is there any entry in the Plaintiff's accounts at Legg Mason, Ryan Beck, or Morgan Stanley consistent with a deposit from the accounts of Ashwell Management Ltd. or from the account of Centigon during 2001 and 2002.

59.     Accordingly, the Court finds that there is clear and convincing evidence that Dana intentionally converted to her own use the $1.5 million received by Ashwell Management Ltd. from Plaintiff.

**Review of Centigon's Hudson United Bank Account and
Ashwell Management's Hudson United Bank Account**

60.     On or about August 15, 2002, Morgan Stanley confirmed to Sabine Jones that her Account 241-015922-0-122 had wire transferred $148,760, Ex. 10, to Hudson United Bank for the benefit of Centigon Account No. 0210004660. Ex. 32 at C1138.

61.     At or about the time the first deposit of $148,760 was made into this Centigon Hudson United Bank account, the balance in that account was $405.83. Tr. at 657:7-11; Ex. 32 at C1139; Ex. 36. In the fifteen months prior to this deposit, only one other credit (for $1,500) appears on the Centigon Hudson United Bank account statements. Tr. at 657:21-658:10; Exs. 32, 41. During that same fifteen-month period, the balance in the Centigon Hudson United Bank account ranged from a low of $62.76 to a high of $1,544.81. Id.

62.     On August 15, 2002, Centigon's account 0210004660 at Hudson United reflects the receipt of $148,760. Ex. 32 at C1138-39. On August 30, 2002, Centigon's account shows a transfer of $43,270, id., to Account 0210002739, the Hudson United Bank account for Ashwell Management Ltd., c/o Centigon, Inc., P.O. Box 1767, FDR Station, New York, NY 10022. Id. at A122.[4] On September 5 and September 23, 2002, Centigon's Hudson United account shows further transfers of $4,200 and $30,240 to the

---

[4] Hudson United Bank's Centigon, Inc. statements are also addressed to P.O. Box 1767, FDR Station, New York, NY 10022.

Ashwell Management Account at Hudson United.  Id. at C1140.  On October 3, October 17, and October 23, 2002, Centigon's account shows transfers of $7,250, $10,000, and $4,105, respectively, to Ashwell Management's account at Hudson United.  Id. at C1142.

63.     In November 2002, Centigon's account at Hudson United shows transfers of $5,000, $3,450, $5,500, and $4,250 to Ashwell Management's account at Hudson United.  Id. at C1144.  In December 2002, Centigon's account at Hudson United shows transfers of $4,559, $4,150, and $2,500 to Ashwell Management's Hudson United account and a single check drawn for $18,520.89.  Id. at C1146.  In December 2002, an account for Plaintiff (account 72G-108466) was opened by Ryan Beck with a deposit of $18,520.89.  Ex. 12.  There were no other withdrawals from Centigon's accounts during the period from August to December 31, 2002.  Ex. 32 at C1138-1147.

64.     On January 22, 2003, Ashwell Management's account at Hudson United reflects a deposit of $75,000.  Id. at A139.  This check, dated January 15, 2003, was drawn on Ashwell Management's Morgan Stanley account.  Id. at A180-81.  In January 2003, Centigon's account reflects receipt of a transfer of $64,000 from Ashwell Management's Hudson United account and a check signed by V.B. Campbell to the order of Ryan Beck for $62,725, dated January 21, 2003, for account 72G-108466.  Id. at C1149.  Ryan Beck's account for Plaintiff, 72G-108466, shows receipt of $62,725 in January 2003.  Ex. 12.

65.     Centigon's Hudson United account for the period ending February 28, 2003 shows no additions to Centigon's account.  Ex. 32 at C1151.

66.     Centigon's Hudson United account's next deposit, $22,050.50, was received on March 14, 2003 from Ashwell Management Ltd.'s Morgan Stanley account.

22

Id. at C1153-1157.

67.     On March 19, 2003, Centigon made a wire transfer of $20,500, id. at C1152, and in March, Plaintiff's Ryan Beck account reflects a receipt of $20,500.  Ex. 12.  Thereafter, the Centigon account reflects no further transfers to Plaintiff's accounts.

68.     On August 18, 2003, Sabine Jones' check for $75,000 for "Pioneer High Yield," Ex. 15, was deposited in Centigon's Hudson account.  Ex. 32 at C1183.

69.     On September 8, 2003, Centigon's Hudson United account transferred $12,000 to Ashwell Management's Hudson United's account number 0210002739.  Ex. 32 at C1184, A366.  On September 17, 2003, Centigon transferred $7,500, and on September 23, 2003 Centigon's Hudson United account transferred $15,000, to Ashwell Management's Hudson United account, leaving a balance after charges of $35,076.93. Id.  On September 5, 2003, Ashwell Management's Hudson United account transferred $1,750 to J.M. Dana's Union Planters National Bank account number AC0372001487; on September 23, $12,000 was transferred from Ashwell Management's Hudson United account to J.M. Dana's Union Planters account; and on September 30, 2003, $1,500 was wire transferred from the Ashwell Management Hudson United account to the Union Planters account.  Id. at A398, 400-01.

70.     In October 2003, Centigon's Hudson United account made transfers of $4,200, $4,000, $5,200, $4,000, and $7,100 to Ashwell Management's Hudson United account, leaving a balance after charges of $10,505.93.  Neither account at Hudson United reflects any  action indicating any investment of the $75,000 received by Centigon from Plaintiff in August.  Id. at C1186-87.

71.     On November 4, 2003, Centigon's Hudson United account reflected the deposit of a $100,000 check from Sabine Jones for Pioneer Hi Yield. Ex. 15; Ex. 32 at C1188-91. Of this amount, $5,600 and $22,000 were transferred to Ashwell Management's Hudson United account during November 2003, leaving a balance after charges of $82,950.93. Ex. 32 at C1188, A456. There were no additions in December to Centigon's account, but there were transfers of $8,500, $22,000, $10,500, and $6400 to Ashwell Management's account at Hudson United, leaving Centigon a balance of $35,541.93. Id. at C1192-93, A497. On December 11, 2003, Ashwell Management's Hudson United account wire transferred $15,500 to Ashwell Management Citibank's account. Id. at A497; Ex. 31 at C00098.

72.     On December 28, 2004, Sabine Jones sent to Dana a check payable to Centigon in the amount of $72,440; that check was deposited in Centigon's Hudson United account on January 8, 2004. Ex. 32 at C1194, 1197. On January 21, 2004, Centigon transferred $18,000 to Ashwell Management's Hudson United account, leaving a balance after charges of $89,968.93. Id. at C1194. In February, Centigon transferred $5,200 and $10,000 to Ashwell Management's Hudson account, id. at C1198, and on March 2, 2004, Centigon transferred another $7,450. Id. at C1200.

73.     On March 9, 2004, Plaintiff drew a check for $61,718.00 to Centigon, which was deposited on March 11, 2004. Ex. 32 at C1200, 1202-03. On March 11, 2004, the Centigon Hudson United account transferred $20,000 to Ashwell Management's Hudson United account, id. at C1200; on March 22, 2004, Centigon Hudson United transferred $5,500, and on March 30, it transferred $10,500, both to Ashwell Management's Hudson United account. Id. at C1201.

74.     On April 21, 2004, Plaintiff drew a check payable to Centigon for

$45,000, which was deposited on April 27, 2004 into Centigon's Hudson United account.

Id. at C1204-05, 1207.  Prior to that date, in April 2004 Centigon transferred $10,000 and

$45,000 to Ashwell Management's Hudson United account.  Id. at C1204.  On April 28,

2004, Centigon transferred another $18,000 to Ashwell Management Ltd.'s Hudson

United account, leaving a balance after charges of $65,007.93.  Id.

75.     In May 2004, Centigon's Hudson United account received no additions

but transferred $12,000, $6,500, and $7,200 to Ashwell Management's Hudson United

account, leaving a balance after charges of $39,296.93.  Id. at C1208, A643.

76.     On June 9, 2004, Plaintiff drew a check for $48,100 to Centigon, Inc.,

which was deposited in Centigon's Hudson United account on June 16, 2004.  Id. at

C1210-13.  On June 9 and June 23, 2004, Centigon transferred $6,500 and $7,400 to

Ashwell Management's Hudson United account, leaving a balance after charges of

$73,485.93.  Id. at C1210, A671.

77.     In July 2004, the Centigon's Hudson United account had no additions, but

transferred $12,000 and $10,000 to Ashwell Management's Hudson United account,

leaving a balance after charges of $51,476.93.  Id. at C1214, A690.  On July 27, 2004,

Ashwell Management transferred $5,200 to its Citibank account.  Ex. 31 at C000123.

78.     On July 27, 2004, Plaintiff drew a check for $36,535 to the order of

Centigon, which was deposited in Centigon's account on August 12, 2004.  Ex. 32 at

C1216-17, 1220.  In August, Centigon made transfers to Ashwell Management's Hudson

United account of $6,400 and $5,850, id. at C1216, A722, and on August 1, 2004,

Centigon drew a check for $24,709.10, payable to Ashwell Management, Ltd. and signed

by V.B. Campbell, which was deposited by Ashwell Management in its Citibank account on August 12, 2004. <u>Id.</u> at C1218; Ex. 31 at C00123. Centigon's balance after charges was $51,063.83 on August 31, 2004. Ex. 32 at C1216.

79.     In September 2004, there were no withdrawals and no deposits in Centigon's Hudson United account, but there were telephone transfers to Ashwell Management's Hudson United account of $8,500 and $30,000, leaving a balance after charges of $12,554.83. <u>Id.</u> at C1221, A746. Ashwell Management's Hudson United account also reflects a wire transfer in of $28,500 and two wire transfers out of $28,500 and $28,500, <u>id.</u> at A746, to J. M. Dana's personal accounts at Citibank, Accounts 0372001487, <u>id.</u> at A772, and A54819572. <u>Id.</u> at A773.[5] (These accounts were not produced to the Court.)

80.     On October 11, 2004, Plaintiff drew a check for $46,118.00 to the order of Centigon, which was deposited in Centigon's Hudson United account on October 20, 2004. <u>Id.</u> at C1224. On October 13 and October 28, 2004, Centigon transferred $5,500 and $32,000 to the Ashwell Management Hudson United account, leaving a balance after charges of $21,163.83. <u>Id.</u> at C1223, A776. On October 24, 2004, Ashwell Management Ltd. by V. B. Campbell drew a check for $20,500 on Ashwell Management's Hudson United account, which was deposited to the Citibank account on October 27, 2004. <u>Id.</u> at A776, 801; Ex. 31 at C00132.

81.     On November 11, 2004, Plaintiff drew a check for $37,805, payable to Centigon, which was deposited in Centigon's Hudson United account on November 22, 2004. Ex. 32 at C1228-1230. On November 15, 2004, Centigon transferred $12,500 to

---

[5] The beneficiary is J.M. Dana at 590 Madison Ave., New York, NY.

Ashwell Management's account at Hudson United, leaving a balance after charges of $46,459.83.  Id. at C1227-28.

82.     In December 2004, there were no additions to Centigon's Hudson United account and one telephone transfer to Ashwell Management's Hudson United account of $14,500, leaving a balance after charges of $31,952.83.  Id. at C1231, A841.

83.     On January 4, 2005, Plaintiff drew a check for $47,343.00, payable to Centigon, which was deposited in Centigon's Hudson United account on January 12, 2005.  Id. at C1234-36.  On January 3, 18, and 25, 2005, Centigon made transfers to Ashwell Management's Hudson United account of $5,500, $18,750, and $17,500, respectively, leaving a balance after charges of $37,538.83.  Id. at C1233-34.  On January 18, 2005, Ashwell Management by V.B. Campbell drew two checks for $5,500 payable to Dr. Jerome Leff, one of which was a security deposit.  Id. at C1233, A875.

84.     In February 2005, Centigon received no deposits, but transferred $4,500, $7,400, $7,840, and $5,500 to Ashwell Management's Hudson United account, leaving a balance after charges of $12,287.83.  Id. at C1237-38, A910.  In March 2005, Centigon received no deposits, but made transfers to Ashwell Management of $6,700, $3,200, and $1,204, leaving a balance after charges of $1,174.87.  Id. at C1239, A938.

85.     On April 6, 2005, Plaintiff drew a check payable to Centigon for $31,440.00, which was deposited in the Centigon Hudson United account on April 15, 2005.  Id. at C1242-44.  In April 2005, Centigon transferred $500, $500, and $10,500 to Ashwell Management's Hudson United account.  Id. at C1241, A964.

86.     On May 10, 2005, Plaintiff wrote a check for $22,440 payable to Centigon, which was deposited in Centigon's Hudson United account on May 12, 2005.

Id. at C1246-48. Centigon's only transfers consisted of $10,000, $7,200, and $4,750 to Ashwell Management's Hudson United account on May 9, May 12, and May 18, 2005, respectively. Id. at C1245, A978. Ashwell Management's account at Hudson United reflects a check signed by V.B. Campbell on May 1, 2005 for $5,500 to Dr. Leff, id. at A986, and a May 10, 2005 check to Ashwell Management, Ltd. for $4,830 that was deposited in its Citibank account. Id. at A1007.

87.     In June 2005, Centigon received no deposits but transferred $11,250, $4,200, and $5,050 to Ashwell Management's Hudson United account, leaving a balance after charges of $3,071.83. Id. at C1249, A1013.

88.     No further deposits were made to Centigon Hudson United account for the remainder of 2005, and only one transfer was made out to Ashwell Management for $600 on July 26, 2005. Id. at C1251. A review of all of the Hudson United Centigon statements shows no other deposits in the account and virtually no debits other than for the benefit of Ashwell Management, Ltd.

**The Ashwell Management Accounts Do Not Reflect the Receipt of
Significant Amounts from Any Source Other than Plaintiff**

89.     Instead of using Plaintiff's $1,500,000 to invest in Ashwell Management Ltd., during the period from and including September 21, 2001 to and including September 24, 2002, Dana gradually transferred $1,228,431.10 out of the Ashwell Management Citibank account to Ashwell Management Ltd.'s margin account number 022024593 at Morgan Stanley; to Ashwell Management Ltd.'s account number 0210002739 at Hudson United Bank; and to the Pilar J. Dana account number 396-10543 at Legg Mason (the "PJD Legg account"). Tr. at 553:3-561:8, 635:19-637:20; Ex. 38. Dana either used the balance ($271,568.90) of that $1.5 million for her personal expenses

or made transfers to third parties. None of these withdrawals are consistent with the purchase of a limited partnership interest of $1.5 million for Plaintiff or for the Jones Living Trust. Tr. at 593:8-13, 648:7-21; Exs. 31, 38.

90.     Dana made $1,015,000 in deposits into the Ashwell Management Morgan Stanley account from the Ashwell Management Citibank account. Tr. at 635:19-24; Ex. 36. The Court's review of the Ashwell Management Citibank account and Ashwell Management Morgan Stanley account shows that Dana withdrew $1,015,000 from the Citibank account for deposit into the Ashwell Management Morgan Stanley account. From the opening of the Ashwell Management Morgan Stanley account in September 2001 until January 31, 2006, the records show that the only deposits made into the Ashwell Management Morgan Stanley account were from the Citibank account, Exs. 28 and 36, and that none of these deposits into the Ashwell Management Morgan Stanley account were ever used to purchase any limited partnership interest for or on behalf of either Plaintiff or the Jones Living Trust.

91.     The Ashwell Management Morgan Stanley account was a trading account, as well as an account on which Dana could write checks and for which she had been issued a debit card. Tr. at 572:22-573:9; Ex. 22. From September 2001, when the account opened, until and including January 31, 2006, trading gains in the account amounted to $99,250.94. Tr. at 643:25-645:23; Ex. 28. Consequently, during this same period, the total combined amount of funds deposited into the account from the Ashwell Management Citibank account and funds credited as trading gains was $1,114,250.94.

92.     Dana transferred or spent all of this $1,114,250.94 out of the Ashwell Management Morgan Stanley account, and none of this money was used to purchase any

limited partnership interest or other investment for or on behalf of Plaintiff or the Jones Living Trust. Tr. at 593:8-13, 648:7-21. From the $1,114,250.94, Dana transferred $21,550.00 to herself, $22,690.12 to P.J. Dana, $44,565.16 to Dr. Leff (the landlord of apartment 62B at 146 W. 57th St., New York, New York, where Defendant lives when she is in New York City), and $368,861.96 to the Ashwell Management Hudson United Bank account. Id. at 647:2-648:6; Exs. 28, 39. From this $1,114,250.94, Dana also charged debit card expenses totaling $593,741.77 and made $62,841.93 in additional transfers. Exs. 28, 39.

### The Ashwell Management and Centigon Accounts Show That Plaintiff's Deposits into Centigon, with Three Exceptions, Were Transferred to Ashwell Management

93.     After Dana's receipt and utilization of the $1.5 million from Plaintiff, on or about the following dates Plaintiff, at Dana's direction and based on her recommendations, authorized and made wire transfers to Centigon, Inc., or authorized and issued checks made payable to Centigon, Inc. but sent directly to Dana, Tr. at 293:6-17, in the following amounts:

| Date | Amount | Ex. 32 Bates Number |
|------|--------|---------------------|
| August 15, 2002 | $148,760 | C1139 |
| August 18, 2003 | $ 75,000 | C1183 |
| November 4, 2003 | $100,000 | C1191 |
| January 8, 2004 | $ 72,440 | C1197 |
| March 11, 2004 | $ 61,718 | C1203 |
| April 27, 2004 | $ 45,000 | C1207 |
| June 18, 2004 | $ 48,100 | C1213 |
| August 12, 2004 | $ 36,555 | C1220 |
| October 20, 2004 | $ 46,118 | C1226 |
| November 22, 2004 | $ 37,805 | C1230 |
| January 15, 2005 | $ 47,343 | C1236 |
| April 15, 2005 | $ 31,440 | C1244 |
| May 12, 2005 | $ 22,440 | C1248 |

Plaintiff's purpose in sending these wire transfers and checks was to either pay Centigon

or enable Centigon to pay for purchases of securities for the account of Plaintiff or the Jones Living Trust. Id. at 108:13-109:8, 838:20-840:9. In total, from in or about August 2002 to in or about May 2005, Plaintiff, at Dana's direction and based on Dana's recommendations, sent Centigon $772,719.00. Id. at 652:20-22. These funds were deposited into account number 0210004660 in Centigon, Inc.'s name at Hudson United Bank. Ex. 32 at C1138, 1183, 1191, 1197, 1200, 1203, 1207, 1213, 1220, 1226, 1230, 1236, 1244, 1245, and 1248. On January 31, 2006, the balance in this account was $1.83. Tr. at 623:4-8; Ex. 32 at C1257; Ex. 36.

94.     Between August 2002 and January 2006, in addition to the $772,719.00 which Plaintiff sent to Centigon and which was deposited into the Centigon Hudson United Bank account, another $91,490 was deposited into the Centigon Hudson United Bank account. Tr. at 651:23-652:9, 654:19-655:4; Exs. 32, 41. The $91,490 came from (1) the Ashwell Management Morgan Stanley account in the amounts of $22,050 and $5,440 on or about March 10, 2003 and April 8, 2003 (from a check dated April 1, 2003), respectively, and (2) the Ashwell Management Hudson United Bank account in the amount of $64,000 on or about January 27, 2003. Tr. at 652:7-654:24; Ex. 32 at C1149, 1151, 1159, 1173.

Because all the amounts in the Ashwell Management Morgan Stanley account came only from funds in the Ashwell Management Citibank account, and because the Ashwell Management Citibank funds were there almost entirely as a consequence of Plaintiff having wired $1,500,000 into that account, Tr. at 631:8-632:25, the Court concludes that the deposits into the Centigon Hudson United Bank account on March 10 and April 8, 2003 were from amounts Plaintiff tendered on Dana's recommendation and

at her insistence as consideration for an Ashwell/Pequot limited partnership interest.

The $64,000 transferred to Centigon from the Ashwell Management Hudson United Bank account on January 27, 2003 came from the $75,000 deposited into that account from the Ashwell Management Morgan Stanley account on January 22, 2003, Ex. 32 at A181, and from the closing balance in the Ashwell Management Hudson United Bank account on December 31, 2002 of $14,545.26, id. at A134, which in turn was from a December 17, 2002 deposit into that account from the Ashwell Management Morgan Stanley account in the amount of $20,000. Id. at A136; Ex. 28 at MS00152, Because all of the deposits in the Ashwell Management Morgan Stanley account were withdrawals from funds in the Ashwell Management Citibank account, Tr. at 641:19-642:3; Exs. 28, 36, and were almost entirely traceable to Plaintiff's $1,500,000 transfer to the Citibank account, the $64,000 deposited into Centigon's Hudson United Bank account on or about January 27, 2003 was money Plaintiff wired on Dana's recommendation and at her insistence as consideration for an Ashwell/Pequot limited partnership interest.

95.     In sum, between August 2002 and May 2005, $864,209 was deposited into the Centigon Hudson United Bank account. Of that amount, $772,719 came directly from Plaintiff, on Dana's recommendation, for the purchase of securities by Centigon for Plaintiff's or the Jones Living Trust's account, and $91,490 was transferred from funds in two Ashwell accounts – the Ashwell Management Hudson United Bank account and the Ashwell Management Morgan Stanley account – which are traceable to the $1.5 million Plaintiff sent to Dana for the purchase of an Ashwell/Pequot limited partnership interest. Ex. 41.

96.     Of the $864,209 in Plaintiff's funds deposited into the Centigon Hudson

United Bank account, $732,614 was transferred to the Ashwell Management Hudson United Bank account, $24,709.10 was transferred in or about August 2004 to the Ashwell Management Citibank account, and $101,745.89 was used for Plaintiff's benefit via three deposits to Plaintiff's Ryan Beck brokerage account. Tr. at 660:17-661:8; Ex. 12. The transfers into Plaintiff's Ryan Beck account constitute returns of funds Plaintiff had sent to either Centigon or Ashwell Management, Ltd., and Plaintiff will exclude those funds, and adjust for her receipt of interest of $6,030.10 in April 2002, in her calculation of damages.

97.     As of August 31, 2001, the balance in the Ashwell Management Hudson United Bank account was $6,843.40. Ex. 32 at A74; Ex. 37. Between September 21, 2001 and October 4, 2005, $1,209,186.95 was deposited into the Ashwell Management Hudson United Bank account. Tr. at 663:12-15; Ex. 42. All of the $1,209,186.95 is traceable to funds paid by Plaintiff to either Ashwell Management Ltd. or Centigon Inc. on the recommendations of Dana for the purpose of purchasing, for Plaintiff's account or the account of the Jones Living Trust, a limited partnership interest (in the case of Ashwell Management Ltd.) or securities (in the case of Centigon). Tr. at 667:6-22; Ex. 42.

98.     On or about January 31, 2006, the closing balance in the Ashwell Management Hudson United Bank account was $1.94. Ex. 32 at A1072. The closing balance in the month prior was $78.08. Id. at A1064. In other words, by January 2006, except for $78.08, whatever had been deposited or transferred into the Ashwell Management Hudson United Bank account had been spent or transferred out of that account. Tr. at 666:19-24. Of the $595,338.54 transferred out of the Ashwell

Management Hudson United Bank account subsequent to September 21, 2001, $223,636.60 was sent to the Ashwell Management Citibank account, $105,478.10 was sent to Dana herself, $12,471.30 was sent to P.J. Dana, and $253,752.54 had been transferred to third parties. Exs. 32, 42. Dana has not shown that any of these transfers or amounts spent were for purchases for or on behalf of Plaintiff or the Jones Living Trust. Tr. at 607:6-13. In addition, an examination of the Ashwell Management Hudson United Bank account records demonstrates that, of the additional unscheduled amounts transferred or spent out of the Ashwell Management Hudson United Bank account subsequent to September 21, 2001, none of these funds were used for deposits for, or on behalf of, Plaintiff or the Jones Living Trust in her accounts at Legg Mason, Ryan Beck, or Morgan Stanley. Id.; Exs. 11, 12, 13, 32.

## The Pilar J. Dana Account Consists of Plaintiff's Funds

99.     On or about the following dates, the following amounts were transferred or deposited into the PJD (Pilar J. Dana) Legg account. Exs. 43, 45.

| Transaction Number | Date | Deposit Amount |
|---|---|---|
| 1 | August 28, 2002 | $30,000 |
| 2 | September 9, 2002 | $25,000 |
| 3 | September 23, 2002 | $18,000 |
| 4 | February 25, 2003 | $ 7,000 |
| 5 | March 11, 2004 | $ 7,500 |
| 6 | March 31, 2004 | $ 5,500 |
| 7 | August 12, 2004 | $ 6,500 |

These are the only amounts that were transferred or deposited into the PJD Legg account from sources outside that account. Tr. at 673:19-674:2; Exs. 43, 45. The other amounts credited to that account were trading gains or earned interest on the account. Ex. 45.

100. Dana was authorized to trade the funds in the PJD Legg account. Transcript of the Deposition of Dana at 38; Tr. at 1329:1-20. Dana also opened the PJD Legg account. Ex. 29 at Q4. Although she denied it, expert handwriting testimony shows that Dana signed the "Pilar J. Dana" signature on the account opening documents for the PJD Legg account.[6] Tr. at 980:23-25; Ex. 29 at Q4. Of the seven deposits to the PJD Legg account, see supra ¶ 99, Dana made the first four of them (totaling $80,000). Tr. at 829:1-831:25. The first and fourth, in the amounts of $30,000 on or about August 26, 2002 and $7,000 on or about February 20, 2003, were made via checks numbered 1009 and 1012, signed by Dana and drawn on the Ashwell Management Morgan Stanley account. Id.; Ex. 44. The second and third, in the amounts of $25,000 on or about September 9, 2002 and $18,000 on or about September 23, 2002, were made via checks numbered 1082 and 1083, signed by Dana and drawn on the Ashwell Management Citibank account. Id. At the time these checks were written, the only funds available in the Ashwell Management Morgan Stanley account were directly traceable to funds which Plaintiff had tendered on Dana's recommendation and direction (with the possible exception of $5,500, Ashwell Management's pre-existing balance in the Citibank account, Ex. 31) as payment for Plaintiff's or the Jones Living Trust's limited partnership interest in Ashwell/Pequot. Exs. 28, 39. The only funds in the Ashwell Management Citibank account were funds either tendered by Plaintiff for the Ashwell or Pequot investment (with the possible exception of $5,500), or were funds which Plaintiff had tendered on Dana's recommendation and direction as payments for securities purchased or to be purchased by Centigon, Inc. for Plaintiff's or the Jones Living Trust's account,

---

[6] Pilar J. Dana did not testify or submit any affidavits in this action.

which were then transferred from the Centigon Hudson United Bank account (into which they had been initially deposited) to the Ashwell Management Hudson United Bank account and then to the Ashwell Management Citibank account.  See <u>supra</u> ¶¶ 94-95. Centigon's transactions demonstrate that it was not a brokerage house, as represented by Dana.

101.    Consequently, of the initial four deposits totaling $80,000 made by Dana into the PJD Legg account, all of the funds for those deposits came from funds which were supplied by Plaintiff.  Tr. at 676:10-677:9, 704:19-705:1, 712:17-715:9, 721:3, 721:10-723:5.  Dana did not deny these facts, nor did she explain the source of the remaining three deposits into the PJD Legg account.  In view of Dana's conversion of Plaintiff's funds for her own use, as well as the other findings made by the Court as to Dana's clear lack of credibility, <u>see</u> <u>supra</u> ¶¶ 103-04, the Court finds that Plaintiff has satisfied its burden that the last three deposits into the PJD Legg account also came from funds tendered by Plaintiff as payment either for the Ashwell/Pequot limited partnership interest or for the securities purchased or to be purchased by Centigon for Plaintiff's account.  The gains on the PJD Legg account thus constitute gains made on funds tendered by Plaintiff which were not used for their intended purpose.

102.    In sum, of the $1,500,000 that Plaintiff sent to Ashwell and the $772,719 that Plaintiff sent to Dana for an investment in Centigon, only $101,745.89 was returned to Plaintiff, leaving $2,170,973.11 of Plaintiff's funds missing.

### Credibility of the Defendant

103.    Dana's testimony as a whole was evasive and not credible.  Many of Dana's answers to questions posed at the trial were non-responsive.  <u>See</u>, <u>e.g.</u>, Tr. at

1144:10-18, 1147:3-15, 1171:11-16.  Dana also repeatedly testified to a lack of recollection or knowledge regarding facts of which one would expect a person with her purported experience (over twenty years as a financial advisor, see id. at 563:7-10) to have some knowledge or recall.  Id. at 440:4-441:25, 443:10-20, 480:1-11, 495:5-21, 532:4-20, 539:9-21, 550:3-25, 839:5-840:9, 857:6-17, 867:1-22.

104.    Much of Dana's testimony was either evasive, inconsistent, false, or refuted by other witnesses and documents.  In particular:

- Dana's testimony that she was a frequent visitor to the Zapata Ranch prior to Mr. Jones' death was contradicted by Plaintiff and her ranch manager, Ms. Roth.  Id. at 18:15-19:7, 1057:9-23, 1059:9-14, 1080:21-1081:4.

- Despite her claimed expertise in financial matters, Dana professed not to understand the meaning of checkbook entries written in her own hand.  Id. at 402:20-407:5; Ex. 9.

- Dana stated that Plaintiff's Ashwell investment was in Ashwell LP.  Tr. at 430:22-23.  Dana never produced any documentation of that investment, however, even though she claimed to have received a statement of such from Ashwell LP, and the only documents she did produce (which she created) denote Plaintiff's Ashwell investment as "Ashwell Management Ltd." Id. at 1213:18-1214:24; Ex I.

- Although Dana was an officer of Ashwell Management Ltd. from at least September 2001 to late 2005, Tr. at 506:17-507:21, and although Dana testified that she served as a financial advisor to Plaintiff and monitored Plaintiff's investment in Ashwell LP, id. at 427:23-428:15, Dana did not know how or from which account Ashwell LP was paid to fund Mrs. Jones's ostensible purchase of units in the limited partnership.  Id. at 531:5-19.  Dana testified that she has "not been able to find [her] Ashwell Ltd. partnership file at all." Id. at 531:23-532:1.  Dana also could not find the subscription letter she claims Ashwell LP created to evidence Mrs. Jones's purchase, id. at 532:21-533:6, or recall if she ever sent it to Mrs. Jones.  Id. at 533:11-15.

- Although Dana claimed she signed the Ashwell Management's Morgan Stanley account opening documents, Ex. 22, in blank, see

Tr. at 451:12-452:11, Katherine Stansfield of Morgan Stanley testified that she would never add dates or other information to a document after it has been signed by a client. Id. at 985:5-986:15, 997:8-23.

- Dana testified that she retired from Ashwell Management Ltd. and is unable to contact any of the current alleged principals of Ashwell Management, id. at 434:13-22, yet she claims that she continues to serve as the contact person between HQ Global and Ashwell Management and continues to pick up Ashwell Management's mail and/or have that mail delivered directly to her by HQ Global. Id. at 810:9-811:3.

- Although Defendant denied being Valerie B. Campbell or signing the V.B. Campbell signature to any checks in the Ashwell Management Hudson United Bank account or the Centigon Hudson United Bank account, id. at 476:9-477:9, those accounts were used to pay at least two of Dana's Neiman Marcus bills and some of her dog grooming bills from Canine Styles. Id. at 832:7-833:6, 853:16-856:2; Exs. 58, 59.

- Dana represented to Plaintiff and Susan Fuller that Centigon was a brokerage company. Tr. at 108:13-14, 292:4-12. Dana also represented to Carol Johnston of O'Melveny & Myers in September 2005 that Centigon was "related to bonds" and was an excellent investment because it had a guaranteed rate of return. Id. at 1268:24-1269:16, 1270:14-25.

- Although Dana stated that the Centigon to which she directed Plaintiff to send funds is different from the Centigon in which Dana was herself an officer, id. at 856:14-858:16, both entities share the exact same name and both entities have an affiliation with Valerie B. Campbell. Id. at 538:11-22, 861:13-863:4; Ex. 32.

- At trial, Dana stated that James Riordan was a vice president of Centigon, Tr. at 846:13-21, and that she could not recall the identity of the President and CEO of Centigon. Id. at 850:18-851:9. At her deposition, however, Dana identified Riordan as the President and CEO of Centigon. Id. at 849:14-850:8. Dana has not presented any documents demonstrating that Mr. Riordan is employed by Centigon.[7]

- Although Dana identifies herself as Jeanne Marie Dana, she has identified herself and is known as Mrs. Campbell to the doorman at

---

[7] James Riordan did not testify, submit an affidavit, or correspond with the Court in this action.

146 W. 57th Street.  Id. at 253:22–254:8.  She is also known as Ms. Campbell to Ms. Ambey of HQ Global, the company that provides Ashwell Management with telephone and mail service.  Id. at 808:1–810:21.

- Although Dana testified that she did not know why HQ Global communicated with an individual known as "Mrs. Campbell" regarding the Dana Consults Group Inc.'s lease of services from HQ Global, id. at 496:11-14, Dana had repeatedly identified herself to HQ Global as Mrs. Campbell.  Id. at 807:15-809:25, 810:9-811:3, 811:23-813:6; Ex. 26.

- Although Dana claimed that she had never represented herself to be Valerie B. Campbell, Tr. at 477:7-9, two expired credit cards bearing the name Valerie B. Campbell, the signature "V.B. Campbell," and Dana's picture on them, were observed in her apartment on February 18, 2006.  Exs. 25, 63.  Also observed at her apartment were bank statements for Ashwell Management Ltd. with copies of checks signed by Valerie B. Campbell located in a box near Dana's bed, Tr. at 1086:12-1087:1, stationery with the initials "VBC" next to stationery with the initials "JMD," business cards printed with the name "Valerie B. Campbell, managing director Ashwell Management Ltd.," a cable bill in the name of Barbara Campbell, id. at 1088:14-1089:6, a folder of unpaid bills (located on top of her bed) and unopened mail addressed to various names, including Jeanne Marie Dana, J.M. Dana, J. Dana Campbell, J. Martin Dana, Jennifer Dana, Jeanne Dana, Valerie Campbell, V. Campbell,  VB Campbell, B. Campbell, Jeanne Campbell, Jennifer Campbell, Pilar Dana, Ashwell and Ashwell Management Ltd., id. at 1090:18-22, 1091:9-11, a Verizon calling card in the name of Pilar Cazalet on top of a table in the bedroom, id. at 1089:7-17, stationery for Ashwell Management located right next to stationery for Dana Consulting Group, id. at 1083:20-1084:18, and blank checks for Ashwell Management Ltd. in a decorative box next to Dana's bed, along with blank checks for J.M. Dana in the same box.  Id. at 1085:12-24.

- During her visit to the Zapata Ranch in September 2005, Dana had in her possession a telephone bill addressed to Valerie Campbell, credit cards in the name of Ashwell Management Ltd. and Pilar Dana, and a number of blank checks, copies of completed checks, and check registers for various accounts in the name of Ashwell Management Ltd., as well as a credit card receipt for an Ashwell Management Ltd. credit card.  Id. at 1060:14-1067:21; Exs. 9, 66.

- Although Dana claimed not to recall ever possessing credit cards for which she used names other than her own, Tr. at 490:14-16, on February 18, 2006, credit cards with the following names were found at the apartment Dana uses, <u>id.</u> at 891:10-17; Exs. 25, 63:

  | Valerie B. Campbell | Valerie Campbell |
  |---|---|
  | Irene B. Campbell | Jean W. Campbell |
  | W. B. Campbell | |

  The Ashwell Management Hudson United Bank and Centigon Hudson United Bank records contain the following checks, which appear to have been written to pay credit card bills for the following individuals, as their initials appear on the "For" line of the checks:

  | Check # | Initials | Individual | Ex. 32 Bates # |
  |---|---|---|---|
  | 5565 | WC | Warren B. Campbell | A1820 |
  | 5567 | IBC | Irene B. Campbell | A1822 |
  | 5568 | JWC | Jean W. Campbell | A1823 |
  | 5570 | VC | Valerie Campbell | A1824 |
  | 5858 | VBC | Valerie B. Campbell | A1499 |
  | 5830 | WC | Warren B. Campbell | A1466 |
  | 5835 | VC | Valerie Campbell | A1470 |
  | 5751 | IC | Irene B. Campbell | A1368 |

- When Dana was asked for the location of Centigon's offices, she offered three different answers. At deposition, she claimed the offices were outside of Boston, Tr. at 849:14-19; during her first day of testimony, she claimed the offices were in Stamford, Connecticut, <u>id.</u> at 424:12-19, and during her second day of testimony, she claimed the offices were in Fairfield, Connecticut, <u>id.</u> at 842:9-22. Her testimony is also contradicted by the Centigon bank statements, which show Centigon's address in New York, Ex. 32 at C1180, as the same address as Ashwell Management Ltd. <u>Id.</u> at A137.

- Although Dana was an officer of Ashwell Management Ltd. from at least September 2001 to late 2005, Tr. at 506:17-507:21, when asked for the location of Ashwell Management's offices on her first day of testimony, she claimed that those offices in 2003 were at 590 Madison Avenue, <u>id.</u> at 423:15-19, while on her second day of testimony she "remembered" that in addition to Ashwell Management's virtual office at 590 Madison Avenue, Ashwell Management's main office was at 375 Park Avenue. <u>Id.</u> at 508:5-509:3.

- Dana testified that she used the HQ Global offices at 590 Madison, 21st Floor, as her physical office when she was in New York. Id. at 468:11-469:7. But HQ Global's manager, Ryan Fealey, testified that Dana had never leased actual office space from HQ, not even a temporary office or a meeting room. Id. at 771:9-772:5.

- Dana testified that Apartment 62B at 146 W. 57th St. was not her residence and that she merely "used" that apartment when she was in New York City. Id. at 383:19-20. She also testified that other people had been in the apartment over the past ten years. Id. at 540:2-18. Nonetheless, when the U.S. Marshall's Service executed the seizure order on February 18, 2006, there was no evidence that the apartment was shared with other people. Id. at 1087:12-15. To the contrary, there was only one bed, Dana claimed to own both of the computers in the apartment, and her personal papers were scattered throughout the entire apartment. Id. at 1083:7-1086:24. Moreover, Dana's clothing occupied all the closets and dressers in the apartment, and there were no other closets, dressers, or dresser drawers that appeared to be reserved for others. Id. at 1092:21-1093:15.

- Ashwell Management Ltd. pays the rent on Apartment 62B at 146 W. 57th St. in New York. Id. at 471:13-14. On at least two occasions, Ashwell Management Ltd. also paid the rent on Dana's personal residence in Palm Beach, Florida. Id. at 472:1-473:22; Ex. 32 at A971, 1008.

- Dana testified that completion of the allocation process was delayed due to Plaintiff's failure to fully fund the Marital Trust. Tr. at 1171:25-1172:14. But according to Carol Johnston, Plaintiff's estate counsel, the delay in completing the allocation had nothing to do with Plaintiff. Id. at 1266:13-15, 1319:21-24. Rather, the process was delayed by Dana, who took control of the documents and records necessary to complete the allocation. Id. at 1261:14-1262:6.

- Dana testified that she was forced to interview corporate trustees and to oversee the Marital Trust at certain points in time, but Plaintiff and Carol Johnston both testified that Dana had no role with respect to the Marital Trust and, to the extent she interviewed any corporate trustees, she did so because she wanted to do so, not because she was asked to do so. Id. at 1274:15-1275:2, 1278:13-21.

105.     Although both Centigon, Inc. and Ashwell Management, Ltd. were served in January 2005 through the Secretary of State of Delaware, and although their accounts were frozen, neither Centigon nor Ashwell Management has appeared in this action. V.B. Campbell has not testified, submitted an affidavit, or corresponded with the Court, although her signature appears on checks from both entities.  James Riordan, who Dana testified was an officer of Centigon, <u>id.</u> at 846:13-21, and Robert Scoley, who Dana testified was a principal of Ashwell Management, <u>id.</u> at 885:17-887:22, also did not testify, submit affidavits, or correspond with the Court.

106.     Based on its review of the evidence presented at trial and of the bank account documents, the Court finds that Dana intentionally misled Plaintiff to believe that Centigon, Inc. was a brokerage house so that when Plaintiff tendered her funds to Centigon, Dana could use Centigon as a vehicle to transfer $772,719 to Ashwell Management, Ltd. for her own uses.  Exs. 32, 41.  The Court also finds that Ashwell Management and Centigon were defunct corporations with virtually dormant bank accounts that were used by Ms. Dana under her true name or under the pseudonym "V.B. Campbell" to transfer funds for her own use, and that Ms. Dana had control over and was the alter ego of Ashwell Management, Ltd. and Centigon, Inc.

## Dana's Counterclaim is Not Supported by the Evidence

107.     Plaintiff did not agree to pay Dana any fee for the assistance Dana offered to provide.  To the contrary, Dana offered her services for free based on her past friendship with Mr. Jones and out of concern for the financial future of Plaintiff and Plaintiff's disabled son.  <u>Id.</u> at 123:5-16.  Dana confirmed to Plaintiff and Susan Fuller on a number of occasions that she was not charging for her services.  <u>Id.</u> at 330:12-331:8.

Dana also confirmed to Ms. Johnston that she was not charging Plaintiff any fee for her services. Id. at 179:8-181:1, 1283:23-1285:11.

108.    Dana's testimony regarding her alleged fee agreement is also inconsistent and wholly lacking in credibility. During the period prior to this lawsuit, Dana never billed for her services or sent anything in writing to Plaintiff to suggest she would bill for her services. Id. at 1206:21-1207:2, 1208:19-25, 1209:25-12:12.

109.    Dana's testimony as a whole was not and is not credible. Many of Dana's answers to questions posed at the trial were non-responsive. See, e.g., id. at 1144:10-18, 1147:3-15, 1171:11-16. Dana also repeatedly testified to a lack of recollection or knowledge regarding facts of which one would expect a person with her purported experience (over twenty years as a financial advisor, id. at 563:7-10) to have some knowledge or recall. Id. at 440:4-441:25, 443:10-20, 480:1-11, 495:5-21, 532:4-20, 539:9-21, 550:3-25, 839:5-840:9, 857:6-17, 867:1-22.

## CONCLUSIONS OF LAW

### Jurisdiction/Venue/Waiver of Jury Trial

110.    This Court has subject matter jurisdiction of this civil action pursuant to 28 U.S.C. Section 1332(a)(1) because this dispute involves citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of California. Dana claims to be a citizen of Florida. Ashwell Management, Ltd. and Centigon, Inc. are defunct Delaware corporations. This Court also has subject matter jurisdiction of this civil action pursuant to 28 U.S.C. Sections 1331 and 1367(a) based upon the claims alleged by Plaintiff for violation of the Securities Act of 1934 (15 U.S.C. §78j and 17 C.F.R. §240.10b-5) and the Securities Act of 1933 (15 U.S.C. §§77l & 77q).

111.     Venue is proper in this Court under 15 U.S.C. §§78aa, as well as under 28 U.S.C. §§1391(a)(2), (b)(2) and (c), because a substantial part of the events or omissions giving rise to Plaintiff's claims against Dana occurred in this Judicial District, and a substantial part of the property that is the subject of the action is situated within this Judicial District.

112.     On February 15, 2006, this Court advised the parties of its intention to combine the hearing on Plaintiff's motion for preliminary injunction with a trial on the merits.  On February 16, 2006, per stipulation of the parties, the Court adjourned the hearing for a period of two weeks to allow additional time for the parties to complete discovery.  Defendant Dana was offered additional time for discovery but declined the offer.  On March 6, 2006, the trial resumed.

113.     Plaintiff has not requested a jury trial on any of her legal claims, and Dana did not request a jury trial on any of those claims or on any of its defenses to those claims when, on February 24, 2006, Dana served and filed her Answer and Counterclaims, the last pleading in this case directed to any issue in Plaintiff's complaint which was jury triable.  In addition, the ten-day period within which Dana could have served a demand for such a jury trial has passed and Dana has served no such demand.  See Fed. R. Civ. P. 38(b) (demand for jury trial must be served "not later than 10 days after service of the last pleading directed to such issue").  Accordingly, pursuant to Fed. R. Civ. P. 38, Dana has waived her right to a jury trial on any of her defenses to Plaintiff's legal claims, and the Court may decide Plaintiff's claims for both equitable and legal relief.

**Fraud**

114.     The elements of a cause of action for fraud are: (1) a material false

representation, (2) offered to deceive another and with the intention to induce the other to act or refrain from acting, (3) reliance upon the representation, and (4) damage suffered as a result of that reliance. Gordon & Co. v. Ross, 84 F.3d 542, 544 (2d Cir.1996); J.A.O. Acquisition Corp. v. Stavitsky, 795 N.Y.S.2d 569, 570 (1st Dept. 2005); Chase Manhattan Bank, N.A. v. Perla, 411 N.Y.S.2d 66, 68 (4th Dept. 1978).

115.    Based on the findings of fact set forth above, this Court concludes that Plaintiff has proven each of these elements through clear and convincing evidence and that Dana deliberately and intentionally made Plaintiff the target of her fraudulent scheme; intentionally made misrepresentations and/or omissions of material facts to induce Plaintiff to turn over her Records; intentionally made misrepresentations and/or omissions of material facts to induce Plaintiff to authorize Dana to take control over her financial affairs; and intentionally made misrepresentations and/or omissions of material facts to induce Plaintiff to make significant investments with Ashwell Management and Centigon, which Dana then diverted to her own use.

116.    By misrepresenting herself to be a registered investment advisor with great wealth in her own right, by failing to disclose her relationships with Ashwell Management and Centigon and her diversion of Plaintiff's funds, and by taking active steps to keep such information hidden by withholding from Plaintiff all relevant documents and information, Dana deliberately misled Plaintiff into believing: 1) that Dana's investment advice was honest and unbiased, when in fact it was not; 2) that her funds would be invested in the Pequot Fund, when Dana had no such intention; and 3) that Centigon was a legitimate brokerage house.

117.    The referenced misrepresentations and omissions of material fact were

made by Dana, in person and through the use of interstate telephone calls and facsimile transmissions initiated by Dana in New York and directed to Plaintiff in California.

118.    At the time each of the referenced misrepresentations and/or omissions was made, Plaintiff did not know Dana's representations were false, but rather believed them to be true and reasonably relied upon them.  Had Plaintiff been aware of the true facts, which were not disclosed by Dana, Plaintiff would not have allowed Dana any control over her finances or Records and would not have sought to invest in the Pequot fund or send funds to Centigon.

119.    Because of Plaintiff's relationship of trust and confidence with Dana, her reasonable reliance upon the assurances of Dana as her close friend and trusted investment advisor, and Dana's retention of and her exercise of control over Plaintiff's financial and accounting records, Plaintiff was not aware of any facts that made her suspicious of Dana, and did not begin to suspect Dana's fraud and deceit until in or about September 2005.

120.    As a proximate result of Dana's fraud and deceit, Plaintiff has suffered actual damages through the loss of her funds sought to be invested in the Pequot Fund and with Centigon, which total at least $2,170,973, as well as the loss of interest on those funds at the legal rate from the date of Plaintiff's investments.

121.    In doing the acts identified herein, Dana acted with the intent to defraud Plaintiff.  Accordingly, Plaintiff is entitled to an award of punitive and exemplary damages.  An award of punitive damages is justified "where the defendant['s] fraudulent conduct is gross, wanton or deliberate and demonstrates a high degree of moral culpability.  V.J.V. Transport v. Santiago, 570 N.Y.S.2d 138 (2d Dept. 1991) (upholding

punitive damages on claim of fraudulent conversion) (citing <u>Giblin v. Murphy</u>, 73 N.Y.2d 769 (N.Y. 1988)). Punitive damages are allowable in tort cases such as this so long as the very high threshold of moral culpability is satisfied, <u>Giblin</u>, 73 N.Y.2d at 772, and it is not necessary to prove that the fraud was aimed at the public generally. <u>V.J.V. Transport</u>, 570 N.Y.S.2d at 139 (citing <u>Borkowski v. Borkowski</u>, 39 N.Y.2d 982 (N.Y. 1976)). <u>See also</u> <u>Swertsky v. Dreyer and Traub</u>, 643 N.Y.S.2d 33 (1st Dept. 1996) (reversing dismissal of claim for punitive damages arising out of fraud based on material misrepresentations and material concealment); <u>Lawlor v. Engley</u>, 563 N.Y.S.2d 160 (3d Dept. 1991). The amount of the award is in the sound discretion of the trier of fact. In this case, Dana's conduct was extraordinarily egregious, malicious, willful, and wanton. Dana in essence took advantage of Plaintiff, a recent widow; grossly exploited Plaintiff's desire to provide a secure financial future for herself and her disabled son; stole money from Plaintiff under the guise of being Plaintiff's friend and trusted advisor; and then repeatedly covered up her actions so that they would not be discovered by Plaintiff. The Court concludes that Dana's egregious conduct warrants an award of exemplary or punitive damages in the amount of $1 million.

### <u>Violation of Securities Act of 1934 (15 U.S.C. §78j and 17 C.F.R. §240.10b-5) and Securities Act of 1933 (15 U.S.C. §77l, 77q)</u>

122. Plaintiff's claims under the Securities and Exchange Act of 1934 are based on 15 U.S.C. §78j and 17 CFR § 240.10b-5, which makes it unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of

any security." 17 CFR § 240.10b-5. Plaintiff's claims under the Securities Act of 1933 are based on 15 U.S.C. §77l, which provides, in pertinent part, that "[a]ny person who . . . offers or sells a security . . . by the use of any means or instruments of . . . communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon . . . ." Id.

123.    To state a securities fraud claim under the 1934 Act, a plaintiff must demonstrate that a defendant: (1) made a misrepresentation of fact or an omission (2) of a material fact; (3) with scienter; i.e., intent to deceive; (4) in connection with the purchase and sale of a security; (5) upon which the plaintiff relied; and (6) that the plaintiff's reliance was the proximate cause of the injury for which plaintiff seeks to recover damages. Marcus v. Frome, 329 F.Supp.2d 464, 472 (S.D.N.Y. 2004); Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). A fact is material for purposes of stating a cause of action under Rule 10b-5 if there is a substantial likelihood that a reasonable investor would consider it important in making a decision to buy or sell a security. Basic Inc. v. Levinson, 485 U.S. 224 (1988). In the context of securities fraud statutes, scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct."

Marcus, 329 F.Supp.2d at 472 (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)).  Scienter may be "inferred from proof of 'facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness' or from proof that a defendant had 'both motive and opportunity to commit fraud.'"  Marcus, 329 F.Supp.2d at 472 (internal citations omitted).  Opportunity "entails the means and likely prospect of achieving concrete benefits by the means alleged."  Id. at 473 (internal citations omitted).  Allegations of motive are sufficient if they "entail concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged."  Id.

124.    Based on the findings of fact set forth above, Dana contacted Plaintiff on many occasions to communicate certain material misrepresentations through the use of interstate telephone calls and facsimiles in order to induce Plaintiff to purchase securities through Centigon, which she falsely described as a brokerage company.  Dana further misled Plaintiff by withholding from Plaintiff any records or account statements and other files and records that would have revealed her conversion and theft of Plaintiff's investment funds.  By such actions, Dana prevented Plaintiff from accessing the records, and Plaintiff therefore did not begin to suspect or discover the fraud and deceit of Dana until in or about September, 2005, a date within two years before the commencement of this action.  28 U.S.C. §1658(b).

125.    Based on the foregoing, Dana engaged in fraud in the sale of securities in violation of both the Securities Exchange Act of 1934, 15 U.S.C. §78j and 17 C.F.R. 240.10b-5, and the Securities Exchange Act of 1934, 15 U.S.C. §77l and 77q, each of which allows a private right of action.  As a proximate result of Dana's fraud and deceit, Plaintiff has suffered actual damages through the loss of her funds to be invested with

Centigon, which total at least $772,719, as well as the loss of interest on those funds at the legal rate from the dates of Defendant's receipt of those funds.

## **Breach of Fiduciary Duty**

127.    A fiduciary relationship exists where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge.  WTT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (2d Dept. 2001).  A fiduciary owes his principal undivided and unqualified loyalty and may not act in any manner contrary to the interests of the principal.  A fiduciary is required to make truthful and complete disclosures to those to whom a fiduciary duty is owed and the fiduciary cannot obtain improper advantage at the other's expense.  See, e.g., Cristallina SA v. Christie, Manson & Woods Int'l, Inc., 502 N.Y.S.2d 165, 171 (1st Dept. 1986) ("[a]n agent is subject to a duty to use reasonable efforts to give his principal information relevant to affairs entrusted to him . . .").  The measure of damages for a breach of fiduciary duty is the amount of loss sustained, including lost opportunities for profit on the accounts diverted from it, through defendant's conduct.  Duane Jones Co v. Burke, 117 N.E.2d 237 (N.Y. 1954).

128.    As described above, Dana went to great lengths to insinuate herself into Plaintiff's life and to gain Plaintiff's confidence, ultimately taking on the role of Plaintiff's agent and trusted investment advisor with trading authority over all of Plaintiff's accounts.  As a result, a special relationship developed between Plaintiff and Dana such that Plaintiff reasonably relied on the fidelity, honesty, and integrity of Dana, and Dana, as Plaintiff's investment advisor and agent, owed fiduciary duties to Plaintiff at all times material herein.

129.     Dana breached her fiduciary duties to Plaintiff by the acts and omissions identified above.

130.     As a proximate result of Dana's fraud, deceit, and breach of fiduciary duty, Plaintiff has suffered actual damages through the loss of her funds invested with Ashwell Management and Centigon, which total at least $2,170,973, as well as the loss of interest on those funds at the legal rate from the dates of Defendant's receipt of those funds.

131.     In doing the acts identified herein, Defendants acted with the intent to defraud Plaintiff.  Giblin, 73 N.Y.2d 769 (finding an award of punitive damages proper on claim of breach of fiduciary duty where defendant's conduct is fraudulent, willful, wanton, or reckless and determining that plaintiff is not required to demonstrate harm to public).  Accordingly, Plaintiff is entitled to an award of punitive and exemplary damages.  The amount of that award is in the sound discretion of the trier of fact.  In this case, Dana's conduct was extraordinarily egregious, malicious, willful, and wanton.  Dana took advantage of Plaintiff, a recent widow; grossly exploited Plaintiff's desire to provide a secure financial future for herself and her disabled son; stole money from Plaintiff under the guise of being Plaintiff's friend and trusted advisor; and then repeatedly sought to cover-up her actions so that they would not be discovered by Plaintiff.  The Court concludes that Dana's egregious conduct warrants an award of exemplary or punitive damages in the amount of $1 million.

## Replevin

132.     To prevail on her replevin claim, Plaintiff need only demonstrate a superior possessory right to the chattel at issue, in this case the Records.  See Honeywell

Information Systems, Inc. v. Demographic Systems, Inc., 396 F. Supp. 273, 275

(S.D.N.Y. 1975).  Plaintiff has satisfied this element.  The evidence demonstrates that

Plaintiff is the sole owner of the Records and is entitled to their immediate and exclusive

possession.  Dana has no ownership interest in the Records, and no right to their

possession, and therefore has no defense to Plaintiff's replevin claim.  Nonetheless, Dana

is wrongfully withholding the Records, despite Plaintiff's demands for their return.

133.    Dana's retention of the Records also has significantly impaired Plaintiff's

ability to identify her own investments and to manage her personal affairs.  By

withholding the records, Dana has managed to delay for years Plaintiff's discovery of

Dana's relationship with Ashwell Management and Centigon and Dana's fraud regarding

certain of Plaintiff's funds transmitted for investment at Dana's instructions.

## Conversion

134.    Interference with a right of possession is the essence of conversion.  Under

New York law, "[i]t is well settled that an action will lie for the conversion of money

where there is a specific, identifiable fund and an obligation to return or otherwise treat in

a particular manner the specific fund in question."  Global View Ltd. Venture Capital v.

Great Central Basin Exploration, L.L.C., 288 F.Supp.2d 473, 479 (S.D.N.Y. 2003)

(quoting Mfr. Hanover Trust Co. v. Chemical Bank, 559 N.Y.S.2d 704, 712 (1st Dept.

1990)).

135.    Dana's material misrepresentations and omissions as set forth above were

made with the intent to induce, and did induce, Plaintiff to invest $1.5 million with

Ashwell Management Ltd. upon Dana's recommendation, and to send $772,719 to Dana

for the purchase of securities through Centigon for Plaintiff's account.

136.     Dana's misrepresentations and omissions were materially false and misleading, and she knew of their falsity at the time they were made.  Specifically, although Dana represented that Plaintiff's funds would be used, and had in fact been used, to invest in health care companies through the Pequot Partners Fund and to purchase certain bonds and securities through Centigon for Plaintiff's benefit, the true facts were that such investments were never made for Plaintiff's benefit, and instead Dana converted Plaintiff's funds to her own use.

137.     At the time each of the above-referenced misrepresentations and omissions were made, Plaintiff did not know Dana's representations were false, but rather believed them to be true and reasonably relied upon them.

138.     As a proximate result of Dana's fraud and deceit, Plaintiff has suffered actual damages through Dana's conversion of her funds sent to Ashwell Management, Ltd. and Centigon, which total at least $2,170,973, as well as the loss of interest on those funds at the legal rate from the dates of Defendant's receipt of those funds.

139.     In doing the acts identified herein, Dana acted with the intent to defraud Plaintiff.  Accordingly, Plaintiff is entitled to an award of punitive and exemplary damages.  See Lawlor, 563 N.Y.S.2d at 161; V.J.V. Transport, 570 N.Y.S.2d 138 (2d Dept. 1991) (upholding punitive damages in claim of fraudulent conversion).  The amount of that award is in the sound discretion of the trier of fact.  In this case, Dana's conduct was egregious, malicious, willful, and wanton.  Dana took advantage of Plaintiff, a recent widow; grossly exploited Plaintiff's desire to provide a secure financial future for herself and her disabled son; stole money from Plaintiff under the guise of being Plaintiff's friend and trusted advisor; and then repeatedly sought to cover-up her actions

so that they would not be discovered by Plaintiff. The Court concludes that Dana's egregious conduct warrants an award of exemplary or punitive damages in the amount of $1 million.

## Constructive Trust

140.     Plaintiff also has satisfied the requirements for imposition of a constructive trust. A constructive trust may be imposed where property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest. Majer v. Schmidt, 564 N.Y.S.2d 722 (1st Dept. 1991). Relevant factors in determining whether a constructive trust should be imposed include the existence of a confidential or fiduciary relationship, a promise, a transfer made in reliance on that promise, and unjust enrichment. Simonds v. Simonds, 408 N.Y.S.2d 359 (N.Y. 1978). The evidence demonstrates that a special relationship existed between Plaintiff and Dana, such that Plaintiff reasonably relied on the fidelity, honesty, and integrity of Dana and reposed absolute trust and confidence in her. Dana represented to Plaintiff when she solicited her investments in Ashwell Management and Centigon that she would apply Plaintiff's funds to the purchase of securities, and she continues to represent to Plaintiff that Ashwell Management, the Pequot Partners Fund, and Centigon are holding funds and securities in Plaintiff's name and for her benefit. By virtue of Dana's violation of her relationship of trust and confidence with Plaintiff, as described above, Dana holds Plaintiff's investment funds totaling at least $2,170,973.11 as a constructive trustee for Plaintiff's benefit, and Plaintiff is entitled to the return of those funds.

141.     Instead of investing those funds for Plaintiff's benefit, Dana has diverted

Plaintiff's funds to various accounts (including the PJD Legg account) in Dana's names or alias names, within and without the State of New York, all of which are accessible to and managed by Dana.

## Permanent Injunction

142.    An injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable.  See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) (citing Cavanaugh v. Looney, 248 U.S. 453, 456 (1919)).  The basic requirements to obtain injunctive relief are a showing of irreparable injury and the inadequacy of legal remedies. See Ticor Title Ins. Co., 173 F.3d at 68 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) and New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989)).

143.    Dana obtained the Plaintiff's funds sent to Ashwell Management Ltd. and Centigon Inc. (collectively, the "Converted Funds") through fraud and deceit, and so long as she retains control over those funds or any portion thereof – in any of the Ashwell Management Ltd. or Centigon bank accounts, in the PJD Legg account, in any other account, or in no account at all – there is a real and substantial risk that those funds will be dissipated and/or transferred out of the country to accounts maintained by Dana in Europe or elsewhere.

144.    Plaintiff is therefore entitled to a permanent injunction enjoining and restraining Dana, Ashwell Management Ltd., Centigon, Inc. and their agents, servants, employees, and representatives from engaging in, committing, or performing, directly or indirectly, any and all of the following acts: (a) accessing, transferring, assigning,

pledging, encumbering, concealing, damaging, destroying, or withholding from Plaintiff the Records or any part thereof; (b) accessing, expending, disbursing, transferring, assigning, pledging, encumbering, concealing, or in any manner whatsoever disposing of the whole or any part of the Converted Funds, including but not limited to any funds up to the amount of the Converted Funds plus interest on those funds at the legal rate from the dates of Plaintiff's investments, wheresoever those funds are located, including but not limited to the Ashwell Management Ltd.'s Citibank account, the Ashwell Management Morgan Stanley account, the Ashwell Management Hudson United Bank account, the Centigon Hudson United Bank account, the PJD Legg Mason account, or any other account in the name of Ashwell LP, Ashwell Management Ltd., Centigon, Inc., or in the name of Dana herself or the name J.M. Dana, Dana Consulting, J. Dana Campbell, J. Martin Dana, Chas A. Dana, Pilar Dana, Pilar J. Dana, Pilar Janine Dana, Jeanne Dana, Pilar Cazalet, Jeanne Peters, Valerie Campbell, Valerie B. Campbell, V. Campbell, V.B. Campbell, Barbara Campbell, B. Campbell, Jean W. Campbell, J.W. Campbell, Jeanne Campbell, Irene B. Campbell, Jennifer Campbell, W. B. Campbell, or Warren B. Campbell.

## Dana is Not Entitled to Any Fee

145.    One who owes a fiduciary duty to a principal and who is faithless in the performance of her services forfeits any right to recover compensation, whether commissions or salary, regardless of whether the services were beneficial to the principal. Soam Corp. v. Trane Co., 608 N.Y.S.2d 177, 178 (1st Dept. 1994) (determining that "an agent is held to the utmost good faith in his dealings with his principal, and forfeits any right to compensation for his services if he acts adversely to his employer 'in any part of

the transaction'") (internal citation omitted).  It does not make any difference that the services were beneficial to the principal.  See Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928-29 (N.Y. 1977).  Moreover, where, as here, a party "has engaged in inequitable or unconscionable conduct connected with the matter in litigation," it is not entitled to equitable relief in the form of unjust enrichment or quantum meruit.  Coty v. Steigerwald, 692 N.Y.S.2d 556, 557 (4th Dept. 1999); Cohn & Berk v. Rothman-Goodman Mgt. Corp., 509 N.Y.S.2d 367, 368 (2nd Dept. 1986) (stating that "one may not obtain equitable relief where he himself has engaged in inequitable or unconscionable conduct connected with the matter in litigation, and where the party invoking the doctrine of unclean hands was injured by such conduct").  Given the deliberate and egregious nature of her fraud, Dana is not entitled to a fee as a matter of law.

146.    In addition, Dana has failed to satisfy her burden of proving the existence of a fee agreement with Plaintiff or any basis whatsoever that would support a fee award in her favor as against Plaintiff.  The Court does not find Dana's testimony on this issue to be at all credible, and instead credits the testimony of Plaintiff, Ms. Fuller, and Ms. Johnston regarding the lack of any such fee agreement.  The Court also finds and concludes that, as part of her fraudulent scheme, Dana repeatedly assured Plaintiff and Plaintiff's employees and attorneys (Ms. Fuller, Ms. Roth, and Ms. Johnston) that Dana would not charge any fee for her alleged services.

Enter judgment for Plaintiff against Defendants Jeanne Marie Dana, Ashwell Management, Ltd., and Centigon, Inc. for $2,170,973.11, plus prejudgment interest at 9%

from the dates of Defendants' receipt of the aforesaid payments, and for $1 million in

punitive damages.

IT IS SO ORDERED.

Dated: New York, New York
May 2, 2006

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Opinion and Order sent to:**

*Attorneys for Plaintiff Sabine Jones*

ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 18th Floor
New York, New York 10006
By:     Cornelius P. McCarthy, Esq.
        Ronald Busloff, Esq.
Tel:    212-571-0550
Fax:    212-571-0555

        and

NORTH & NASH LLP
2 Park Plaza, Suite 1020
Irvine, California 92614
By:     Vicki A. Nash, Esq
Tel:    949-752-2200
Fax:    949-752-2230


*Attorneys for Defendants Jeanne Marie Dana, et al.*

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110
By:     Matthew B. West, Esq.
Tel:    212-382-3300
Fax:    212-382-0050